UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kimberly Gerten et al

v.

Civil No. 25-cv-190-LM-TSM
Opinion No. 2026 DNH 128 P

Laborie Medical Technologies Corp.

**O R D E R**

Plaintiffs Kimberly Gerten, M.D., and Gemini Medical Technologies, LLC filed this class action complaint (doc. no. 17) against Laborie Medical Technologies Corp. Plaintiffs contend that Laborie installed a radio frequency-identification (RFID) scanning system on their urodynamics machines to prevent practitioners from using the machines unless they also use Laborie's air-charged catheters. Plaintiffs argue that this practice constitutes a tying arrangement prohibited by § 1 of the Sherman Act and an unlawful use of monopoly power in violation of § 2 of the same. 15 U.S.C. §§ 1, 2. Laborie moves to dismiss (doc. no. 21) pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, Laborie's motion is denied.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679. In antitrust cases, a complaint is generally plausible if it pleads enough facts "to raise a reasonable expectation that discovery will reveal evidence of [an antitrust violation]." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

## BACKGROUND[1]

This dispute concerns technology used by physicians in the practice of urodynamics. Urodynamics is the study of how well the bladder, urethra, and urethral sphincter function as a system to allow for proper urination. During a typical urodynamics exam, a urologist or urogynecologist inserts a catheter into the patient's bladder through the urethra. That catheter fills and empties the bladder with air.[2] A second, pressure-sensing catheter inserted either into the patient's rectum or vagina measures the corresponding intra-abdominal pressure. Both catheters are attached to a machine known as a urodynamics system, which records

[1] The facts are drawn from the amended class action complaint, which is the operative complaint. Doc. no. 17.

[2] The bladder can also be filled with sterile water through the use of a water-filled catheter. Water-filled catheters had been the only method to perform a urodynamics exam until the advent of air-charged catheters in 2001. Today, water-filled catheters are considered outdated and are rarely used.

those pressure readings. The Food and Drug Administration requires that the catheters be single use. Accordingly, each urodynamics exam that a practitioner performs requires new catheters. Urodynamics systems are expensive and typically last "from seven to ten years." Doc. no. 17 at 13.

Laborie is the self-described "industry leader in urodynamics equipment." Id. at 5. Between 2012 and 2015, Laborie acquired four of the largest six competitors in the urodynamics market. Laborie holds itself out as "the largest urodynamics company." Id. at 5. Plaintiffs allege that Laborie "by any measurement dominates the market" for urodynamics systems, and that the two remaining competitors have a "minimal share of the market." Id. at 5-6.

Laborie manufactures and sells multiple lines of urodynamics systems. They also manufacture and sell an air-charged catheter called the "T-DOC Urodynamic Catheter" (T-DOC). Laborie did not invent the T-DOC; it acquired the technology and the patent. Plaintiffs allege that the T-DOC "dominates the market for . . . urodynamic air-charged catheters." Id. at 7. The T-DOC's patent coverage expired sometime during 2021. The T-DOC can connect universally to any urodynamics system; it works irrespective of the urodynamics system's manufacturer.

Gemini also competes in the urodynamics market. It began manufacturing an air-charged catheter, known by its trade name "Atmos," in 2021. The Atmos became commercially viable in 2023. Like the T-DOC, the Atmos is a universal air-charged catheter that works with all of the urodynamics systems on the market. The Atmos

is available at nearly half the price of the T-DOC. Plaintiffs allege that Laborie knew Gemini was entering the catheter market in 2021.[3]

In 2022, shortly after the T-DOC patent coverage expired and Gemini introduced the Atmos, Laborie began equipping their urodynamics systems with RFID scanning technology. That scanning technology reads and identifies the catheters attached to the machine, and prevents the machine from functioning if the attached catheter is not a T-DOC. Laborie began including that scanning technology on all of their new urodynamics systems, and retrofitting machines already in use with the same, sometime at the end of 2023 into the beginning of 2024. Plaintiffs allege that Laborie began planning to develop and implement the scanning system before the T-DOC's patent coverage expired.

Dr. Gerten is a urologist and urogynecologist practicing in Minnesota. Each year, Gerten conducts roughly 400 urodynamics examinations and purchases approximately 800 new catheters. Gerten uses two Laborie urodynamic systems in her practice. Gerten has used the Atmos since it first came to market. She prefers the Atmos both for its lower price and better functionality.

Gerten purchased her first Laborie machine in 2019 and her second in 2022. Gerten's first Laborie machine does not have the RFID scanning technology. When Gerten purchased her second machine, which does include the scanning system, she did not know about the feature. The Laborie representative told her that the new

[3] Gemini is also developing a urodynamics system, but it is not yet on the market.

feature was added "to prevent physicians from 'reusing' catheters on multiple patients." Doc. no. 17 at 10. Gerten was insulted by the explanation; she believes physicians would never reuse catheters because it would be dangerous, unethical, and illegal. Plaintiffs maintain that Laborie has no evidence that any of Laborie's customers have reused single-use catheters.

Gerten has found that the scanning system on her newer Laborie machine often malfunctions, resulting in wasted catheters for her and wasted time for her patients undergoing the urodynamics exam. Gerten has asked Laborie to remove the scanning technology on multiple occasions since she purchased the new machine. At first, her Laborie representative put her off "for many months" and redirected her through the generic company help line. Id. at 10. Finally, in early 2024, the Laborie representative told Gerten that the change could be made, but only in person. Gerten agreed to set up a meeting. But at that meeting the Laborie representative then refused to remove the scanning system without voiding the warranty. Gerten did not agree to the Laborie representative's condition.

Shortly after that meeting, Laborie reached out to Gerten with a "limited time offer" to lower the price of the T-DOC for a one-year period. That offer brought the T-DOC price down and closer to, but still higher than, the cost of the Atmos. Laborie told Gerten that it would charge her the list price for T-DOC—which is almost twice that of Atmos—if she purchased single-use catheters off or outside of that pricing offer. Gerten agreed to the pricing offer.

Gerten continues to purchase the T-DOC for her Laborie machine with the RFID scanning technology and the Atmos for her other machine. Gerten cannot charge a patient more for having to purchase the pricier T-DOC, and insurance companies do not pay more for the urodynamics exam depending on which catheter is used. The discrepancy in catheter cost is borne by Gerten alone.

## DISCUSSION

Laborie argues that plaintiffs have failed to plead sufficient facts with respect to both counts. The court is not persuaded.

### I. Plaintiffs Have Sufficiently Pled Their § 1 Tying Claim

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States" is unlawful under § 1 of the Sherman Act. 15 U.S.C. § 1. Section 1 claims are analyzed either under a "rule of reason" inquiry or under "per se" rules. Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 343-44 (1982). "[T]he rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restrain on competition." Id. at 343. "The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per se* rules." Id. at 333-34. A "per se" rule is a judicially created approach to simplifying the "rule of reason" test for particular restraints. Specifically, based on prior case law, a per se rule creates a "conclusive presumption" (under the rule of reason) that a particular kind of restraint is unreasonable. Id.

A "tying" arrangement may constitute a per se violation of the Sherman Act. Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1178 (1st Cir. 1994), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 166 (2010)). Tying occurs when a seller uses their market power over one product (the tying product) to force consumers to purchase another product from that seller that the consumer otherwise would not have purchased or would have purchased from another source (the tied product). Id. There are four elements to a per se tying claim:

> (1) the tying and tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.

Id. at 1178-79. Plaintiffs allege that Laborie leveraged their control over the market for urodynamics systems (the tying product) to force consumers to purchase their T-DOC air-charged catheters (the tied product).

The complaint adequately alleges the first element: the urodynamics systems and air-charged catheters are two distinct products. Catheters are sold separately from urodynamics machines. Indeed, Gemini introduced the Atmos at a time when it did not sell a urodynamics system. While the machines have a lifespan of seven to ten years, the catheters are single use, and each procedure requires two.

Plaintiffs have also adequately alleged the second element: a tie between the products. Viewing the evidence in the light most favorable to plaintiffs, Laborie knew the T-DOC's patent coverage was expiring and that Gemini was entering the

air-charged catheter market. It is plausible to infer that, in order to prevent practitioners like Dr. Gerten from subsequently purchasing air-charged catheters from Gemini or another competitor, Laborie added RFID scanners to its new urodynamics systems. That technology does not allow the machine to operate with any catheter besides the T-DOC. Laborie furthered the effort by equipping their existing machines already in use with the same scanning technology, and attempting to block practitioners like Gerten from having the technology removed.

With respect to the third element, a seller has market power if it can force a purchaser to make a decision that the purchaser would not make in a competitive market. Eastman Kodak Co. v. Image Tech. Servs., Inc, 504 U.S. 451, 464 (1992); Lee v. Life Ins. Co. of N. Am., 23 F.3d 14, 16 (1st Cir. 1994). Though sufficient market power is often "inferred from the seller's possession of a predominant share in the market," Eastman Kodak Co., 504 U.S. at 464, the operative question is whether the seller can "profitably raise prices substantially above the competitive level." United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001).

When viewed under the favorable motion to dismiss standard, plaintiffs have sufficiently alleged that Laborie has succeeded in exploiting its power in the urodynamics systems market to foreclose competition in the air-charged catheter market. Laborie is the dominant seller of urodynamics systems; their only two competitors have a "minimal share" of the market. Doc. no. 17 at 5. It is plausible to infer from the pleadings that urodynamics systems are expensive and not easily replaced. Since 2022, Laborie urodynamic systems have included RFID scanning

technology that prevents the machine from working if the air-charged catheter was manufactured by any seller besides Laborie. Viewing the amended complaint in the light most favorable to plaintiffs, it can be plausibly inferred that Laborie uses its dominance over the urodynamics systems market to force practitioners like Gerten to purchase the T-DOC at a price higher than what practitioners would pay for other commercially available air-charged catheters. For example, though Gerten learned of the scanning technology after she purchased a newer Laborie urodynamics system, she had to accept and continue to use the machine to sustain her practice. Now, she would prefer to purchase the Atmos for both its lower price and what she views as its better functionality. But she must instead purchase the T-DOC catheter at the price Laborie sets.

Laborie vigorously disputes this. They assert that the complaint's allegations with respect to market power are too circumspect to satisfy even the pleading standard. To be sure, Laborie may ultimately prevail on this argument. But construing all of plaintiffs' market power allegations as true and construing all reasonable inferences in plaintiffs' favor, the court finds that the complaint sufficiently alleges the market share element at this early stage. See Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) (explaining that "no single allegation need establish . . . some necessary element of the cause of action, provided that, in sum, the allegations . . . make the claim as a whole at least plausible" (citation omitted)(brackets omitted)); cf. Eastman Kodak Co., 504 U.S. at 461-62; Data General Corp., 36 F.3d at 1178-79.

Finally, plaintiffs have pled facts adequate to allege the fourth element: that Laborie's "tying" of their urodynamics systems and the T-DOC forecloses substantial commerce in the market for air-charged catheters. As discussed, plaintiffs have plausibly alleged that Laborie exercises market power with respect to urodynamics systems. Each urodynamics exam requires two air-charged catheters. Dr. Gerten alone purchases approximately 800 air-charged catheters each year, and plaintiffs assert in their class action complaint that numerous practitioners across the country are in the same position as Gerten. Those practitioners have been forced to bear the cost of the T-DOC set by Laborie.

## II. Plaintiffs Have Sufficiently Pled a Violation of § 2 of the Sherman Act

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To succeed on a § 2 claim in the tying context, a plaintiff must show that the seller (1) possessed monopoly power in the market and (2) maintained that power through exclusionary conduct. Data General Corp., 36 F.3d at 1181.

With respect to the first element, control over two-thirds of the market has been held sufficient to show monopoly power under § 2. Eastman Kodak Co., 504 U.S. at 481. Exclusionary conduct is "conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." Town of Concord v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir.

1990) (Breyer, C.J.). It is not sufficient under § 2 that the conduct at issue simply harms competitors. Data General Corp., 36 F.3d at 1182. The conduct must harm the competitive process itself and not reflect natural growth or development resulting from competition. Id. "[A] unilateral refusal to deal is prima facie [evidence of exclusionary conduct] if there is evidence of harm to the competitive process; a valid business justification requires proof of countervailing benefits to the competitive process." Id. at 1183 (citing Aspen Skiing v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608-610 (1985), and Eastman Kodak Co., 504 U.S. at 483-486).

Plaintiffs have satisfied their pleading obligations with respect to both elements of a § 2 claim. The amended complaint's allegations, though thin, support a plausible inference that Laborie exercises control over at least two-thirds of the market for both urodynamics systems and air-charged catheters. With respect to element two, plaintiffs allege that Laborie developed and implemented the RFID scanning technology for their urodynamics machines when they knew that their air-charged catheter patent coverage was expiring and that Gemini was preparing to enter the market. Laborie disputes this; they argue that they have no duty to aid Gemini, and that the scanning technology was designed to protect patients from doctors who flout FDA regulations and reuse catheters. But plaintiffs' allegations, if true, suggest that Laborie's patient-safety justification for the scanning technology is pretextual, and that Laborie added the technology to their urodynamics systems solely to quash competition and retain control over prices in the air-charged catheter market. Construing the complaint's allegations in the light most favorable

to the plaintiffs and drawing all reasonable inferences in their favor, plaintiffs' allegations permit the reasonable inference that discovery will yield evidence supporting plaintiffs' claim. See Twombly, 550 U.S. at 556.

**CONCLUSION**

Laborie's motion to dismiss (doc. no. 21) is denied.

SO ORDERED.

Landya McCafferty
United States District Judge

September 10, 2026

cc: Counsel of Record